AUSAs: Rebecca R. Delfiner, Eli J. Mark

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br><br>UNITED STATES OF AMERICA<br><br>            v.<br><br>KEITH TAYLOR,<br><br>                        Defendant. | **24 MAG 2130**<br><br>**SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 1343, 1028A, and 2; and 26 U.S.C. § 7201<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

LaVale Jackson, being duly sworn, deposes and says that he is a Special Agent with the United States Attorney's Office for the Southern District of New York ("SDNY"), and charges as follows:

### COUNT ONE
### (Wire Fraud)

1.      From at least in or about January 2016 through at least in or about May 2024, in the Southern District of New York and elsewhere, KEITH TAYLOR, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, TAYLOR, while acting as founder, president, and chief executive officer ("CEO") of a non-profit organization ("Charity-1") located in Manhattan, New York, embezzled funds from the organization and its donors by initiating unauthorized wire transfers, PayPal payments, and cash withdrawals of more than $2.5 million which TAYLOR used for his own personal expenses.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT TWO
### (Aggravated Identity Theft)

2.      From at least in or about June 2016 through at least in or about May 2024, in the Southern District of New York and elsewhere, KEITH TAYLOR, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, TAYLOR used the names of other persons, by falsely identifying them on Charity-1's website as a purported board of directors, during and in relation to the wire fraud violation charged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

**COUNTS THREE THROUGH EIGHT**
**(Tax Evasion)**

3.       From on or about January 1 of each of the calendar years specified below, through on or about April 15 of the next calendar year, in the Southern District of New York and elsewhere, KEITH TAYLOR, the defendant, willfully and knowingly attempted to evade and defeat a substantial part of the income tax due and owing by TAYLOR to the United States of America for the calendar years specified below, by various means, including, among others: (a) using business accounts to pay personal expenses; and (b) failing to file with the IRS Forms 1040, U.S. Individual Tax Returns, for the calendar years below on or about the date required by law, and failing to report taxable income to the IRS, upon which taxable income, as TAYLOR knew, there was a substantial amount of tax due and owing to the United States of America:

| Count | Calendar Year |
|---|---|
| 3 | 2017 |
| 4 | 2018 |
| 5 | 2019 |
| 6 | 2020 |
| 7 | 2021 |
| 8 | 2022 |

(Title 26, United States Code, Section 7201, and Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4.       I am a Special Agent with SDNY. I have been personally involved in the joint investigation of this matter with the Internal Revenue Service – Criminal Investigations ("IRSCI"). I have also been personally involved in other fraud, identity theft, and tax investigations, and I base this affidavit on that experience, on my conversations with other law enforcement agents, witnesses, and others, and on my examination of documents and various Internal Revenue Service ("IRS") and law enforcement reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Overview

5.       Charity-1 is a New York-based non-profit organization that was formed in Manhattan, New York, in or about 2002. Charity-1 uses a crowd-sourcing funding model to help low-income workers pay for unexpected expenses like medical bills or broken appliances. KEITH TAYLOR, the defendant, is the founder, president, and CEO of Charity-1. *See infra* ¶¶ 9-10.

6.       Between at least in or about 2016 and in or about 2024, KEITH TAYLOR, the defendant, embezzled more than $2.5 million from Charity-1 and its donors, and used that money to fund his lavish personal spending, including dining in New York's most expensive restaurants,

buying high-end electronics, unsuccessful day-trading in stocks, renting a luxury apartment in midtown Manhattan, and paying for his own cosmetic surgery, as described further below. *See infra* ¶¶ 14-19. TAYLOR stole funds from Charity-1 by, among other means, (i) paying his personal expenses directly from Charity-1's bank accounts, (ii) withdrawing cash from Charity-1's bank accounts, (iii) wire-transferring funds from Charity-1's bank accounts to his own personal accounts, and (iv) transferring funds from Charity-1's PayPal accounts into his own personal PayPal account. *See infra* ¶¶ 14(a)-(g).

7. Between at least in or about 2016 and in or about 2024, KEITH TAYLOR, the defendant, attempted to hide his embezzlement of Charity-1 funds by creating a fake board of directors for Charity-1, and claiming it approved his personal spending. TAYLOR used the names of his acquaintances and falsely listed them on the Charity-1 website as board members. TAYLOR's acquaintances who were listed as Charity-1 board members included a bartender, a friend, and a house-cleaner, none of whom ever attended a Charity-1 board meeting or even knew that they had been listed on Charity-1's website as board members. *See infra* ¶¶ 23-28.

8. For at least the calendars years of 2017 through 2022, KEITH TAYLOR, the defendant, did not file personal income tax returns or pay income taxes on the income he received from Charity-1. *See infra* ¶¶ 32(a)-(e).

## Charity-1's Business Model

9. Based on my conversations with other law enforcement officers, current and former employees of Charity-1, and donors to Charity-1, my review of open-source information, my review of law enforcement records, and my review of information provided by employees of Charity-1, I have learned the following, in substance and in part:

   a. Charity-1 is a Manhattan-based non-profit organization that was formed in 2002. KEITH TAYLOR, the defendant, registered Charity-1 with both the IRS and the New York Attorney General's Office as a tax-exempt non-profit institution. Its mission is to provide short-term financial assistance to individuals and families that are living paycheck-to-paycheck who are faced with an unexpected crisis or expense that they cannot pay.

   b. Charity-1 beneficiaries apply to Charity-1 by providing the specifics of their financial situations, and if approved, Charity-1 will post each request for funding on its website. Donors can then select specific applicants they wish to direct funding to, in whole or in part. When an application is funded, Charity-1 directly pays the bill at issue, rather than sending the funding to the applicant.

   c. Charity-1 received significant publicity at the beginning of the COVID-19 pandemic for its ability rapidly to provide relief to low-income workers who were most directly impacted by the pandemic in 2020.

   d. As a result of Charity-1's publicity in 2020, numerous large donors made donations directly to Charity-1 intended to fund not only applicants to Charity-1, but also to support development of Charity-1's infrastructure and to finance its overhead costs.

3

### TAYLOR Controlled Charity-1's Finances

10. Based on my conversations with other law enforcement officers and former employees of Charity-1, and my examination of bank records, I have learned the following, in substance and in part:

a. From at least in or about 2016 through at least in or about 2024, KEITH TAYLOR, the defendant, had exclusive control over Charity-1's finances, accounting, and tax filings. TAYLOR was responsible for Charity-1's fundraising and its interactions with donors.

b. TAYLOR prepared all of Charity-1's financial statements and tax forms.

11. Based on my conversations with other law enforcement officers and on my examination of bank account and IRS records, I have learned the following, in substance and in part:

a. KEITH TAYLOR, the defendant, is a signatory on all of Charity-1's bank accounts and PayPal accounts and has the ability to transfer funds into and out of them.

b. TAYLOR is also the signatory on Charity-1's Forms 990, which the IRS requires tax-exempt organizations to file annually. A charity's Forms 990 are publicly available documents showing how each tax-exempt charitable organization spends the donations it receives, along with other information about the charity. Charity-1's Forms 990 do not list any paid return preparer other than TAYLOR. On Charity-1's Forms 990, TAYLOR is listed as the person who possesses Charity-1's books and records.

c. On Charity-1's Forms 990, TAYLOR reported his annual salary for the relevant years to the IRS as set forth in the chart below:

| Year | Reported Compensation Paid to TAYLOR | Reported Estimate of Other Compensation to TAYLOR |
|---|---|---|
| 2016 | $136,693 | |
| 2017 | $137,500 | $10,188 |
| 2018 | $125,000 | $11,502 |
| 2019 | $137,500 | $13,200 |
| 2020 | $162,819 | |
| 2021 | $193,322 | |
| **2022** | (unfiled) | |
| Total: | **$892,834** | **$32,890** |

### TAYLOR Failed to Differentiate Between Personal and Business Spending

12. Based on my conversations with other law enforcement officers and my examination of Charity-1 and KEITH TAYLOR bank account and PayPal records, I have learned, in substance and in part, the following:

    a. TAYLOR made no distinction between Charity-1 funds that constituted his salary, Charity-1 funds that TAYLOR used for legitimate business expenses, and Charity-1 funds that TAYLOR used on his own personal expenses.

    b. TAYLOR did not pay himself a regular weekly or bi-weekly salary but took funds from Charity-1 as and when he pleased.

13. Based on my analysis of Charity-1 bank accounts and PayPal records, my conversations with witnesses, and my conversations with other law enforcement officers, I have learned, in substance and in part, the following:

    a. For the period of approximately in or about 2016 through in or about 2022, Charity-1 received approximately $9.9 million in total funding from donors.

    b. Of the $9.9 million that Charity-1 received, approximately $5.9 million appears to have been spent on funding applicants to the charity, paying Charity-1 employees other than KEITH TAYLOR, the defendant, and on potentially legitimate Charity-1 business expenses.

### TAYLOR Transferred Charity-1 Funds to His Own Accounts for Personal Use

14. Based on my conversations with other law enforcement officers and my examination of Charity-1 and bank and PayPal records for accounts used by KEITH TAYLOR, the defendant, I have learned, in substance and in part, that TAYLOR embezzled approximately $2.5 million of Charity-1 funds for his own personal use, in addition to the funds that he reported to the IRS as compensation, as set out below:

    a. In or about 2016, TAYLOR withdrew approximately $365,614.13 of Charity-1 funds for his personal benefit, but reported his compensation on the Form 990 as $136,693. For example, in 2016, TAYLOR transferred $163,263.47 directly from a Charity-1 bank account to his personal bank account, withdrew $40,533.75 in cash (with fees) from Charity-1's bank accounts, and used a Charity-1 account to pay for over $18,000 of high-end electronics.

    b. In or about 2017, TAYLOR withdrew approximately $341,285.18 of Charity-1 funds for his personal benefit, but reported his compensation on the Form 990 as $147,688. For example, in 2017, TAYLOR transferred $62,175 from a Charity-1 bank account to his personal bank account, transferred $47,380.87 from Charity-1's PayPal account to his personal PayPal account, withdrew $49,909.25 in cash (with fees) from Charity-1's bank accounts, and used a Charity-1 debit card to pay for personal expenses including TAYLOR's rent in a luxury apartment building and TAYLOR's food delivery services.

    c. In or about 2018, TAYLOR withdrew approximately $339,249.05 of Charity-1 funds for his personal benefit, but reported his compensation on the Form 990 as $136,502. For

example, in 2018, TAYLOR transferred $86,041.10 from Charity-1's PayPal account to his personal PayPal account, withdrew $31,950.25 in cash (with fees) from Charity-1's bank accounts, and used a Charity-1 debit card to pay for personal expenses including TAYLOR's rent in a luxury apartment building and TAYLOR's food delivery services.

   d. In or about 2019, TAYLOR withdrew approximately $309,876.44 of Charity-1 funds for his personal benefit, but reported his compensation on the Form 990 as $150,700. For example, in 2019, TAYLOR transferred $34,307.61 from Charity-1's PayPal account to his personal PayPal account, withdrew $21,074.75 in cash (with fees) from Charity-1's bank accounts, and used a Charity-1 debit card to pay for personal expenses including TAYLOR's rent in a luxury apartment building and TAYLOR's food delivery services.

   e. In or about 2020, TAYLOR withdrew approximately $546,474.27 of Charity-1 funds for his personal benefit, but reported his compensation on the Form 990 as $162,819. For example, in 2020, TAYLOR transferred $124,430.19 from Charity-1's PayPal account to his personal PayPal account, withdrew $34,667.54 in cash (with fees) from Charity-1's bank accounts, and used a Charity-1 debit card to pay for personal expenses including TAYLOR's rent in a luxury apartment building, TAYLOR's food delivery services, and TAYLOR's medical expenses.

   f. In and around 2021, TAYLOR withdrew approximately $1,261,408.86 of Charity-1 funds for his personal benefit, but reported his compensation on the Form 990 as $193,322. For example, in 2021 TAYLOR transferred $425,983.55 from Charity-1's PayPal account to his personal PayPal account, withdrew $38,897.44 in cash (with fees) from Charity-1's bank accounts, and used a Charity-1 debit card to pay for personal expenses including TAYLOR's rent in a luxury apartment building, TAYLOR's food delivery services, and more than $195,000 spent at New York's most expensive restaurants. TAYLOR also wired $204,357.72 of Charity-1 funds to a personal brokerage account in TAYLOR's name.

   g. In and around 2022, TAYLOR withdrew approximately $319,943.55 of Charity-1 funds for his personal benefit, but to date has not filed a Form 990 for Charity-1 or otherwise disclosed his salary from Charity-1. For example, in 2022, TAYLOR transferred $98,320.16 from Charity-1's PayPal account to his personal PayPal account, withdrew $18,109.32 in cash (with fees) from Charity-1's bank accounts, and used a Charity-1 debit card to pay for personal expenses including TAYLOR's rent in a luxury apartment building, TAYLOR's food delivery services, and $44,988.20 in credit card debt for TAYLOR's personal credit card. TAYLOR also wired at least $69,248.01 of Charity-1 funds to a personal brokerage account in TAYLOR's name.

  15. Based on my discussions with other law enforcement officers and representatives of various banks, and my review of bank records, I have learned, in substance and in part, that cash withdrawals from ATMs in Manhattan by KEITH TAYLOR, the defendant, caused wires to be sent to at least one bank's servers located in Virginia and Oregon.

TAYLOR Used Charity-1 Funds for Personal Expenses

  16. Based on my conversations with other law enforcement officers and witnesses, my examination of Charity-1 and bank and PayPal records for accounts used by KEITH TAYLOR, the defendant, and my examination of documents, I have learned, in substance and in part, that

6

TAYLOR used the Charity-1 funds described above, *supra* ¶¶ 14(a)-(g), for his own personal expenses, and not for Charity-1's purposes. *See infra* ¶¶ 17-19.

17. Based on my conversations with other law enforcement officers and my examination of Charity-1 and bank and PayPal records for accounts used by KEITH TAYLOR, the defendant, I have learned, in substance and in part, that from in or about 2017 through in or about 2022, TAYLOR used funds from Charity-1 bank accounts to pay the rent for TAYLOR's home first on the 24th, and later the 30th floor of a luxury apartment tower in midtown Manhattan. In total, TAYLOR used Charity-1 funds to send at least $307,165.52 to the company that manages his apartment building.

18. Based on my conversations with other law enforcement officers and current and former employees from the restaurants described below, and my examination of Charity-1 and bank and PayPal records for accounts used by KEITH TAYLOR, the defendant, I have learned, in substance and in part, that from in or about 2017 and in or about 2022, TAYLOR used funds from Charity-1 bank accounts to pay for his personal meals at some of New York's most expensive restaurants, as described further below:

   a. Jean-Georges is a fine-dining restaurant in midtown Manhattan located approximately a five-minute walk from TAYLOR's apartment building. Jean-Georges has two Michelin stars. TAYLOR used approximately $101,624.96 of Charity-1 funds to pay for meals at Jean-Georges from in or about 2017 through in or about 2022.

   b. A former bartender from Jean-Georges ("Victim-1," as explained below) recalled TAYLOR as a frequent customer at Jean-Georges. Victim-1 recalled that TAYLOR would sometimes go to the bar and order cocktails at Jean-Georges as often as twice a day.

   c. Per Se is a fine-dining restaurant in midtown Manhattan located approximately a six-minute walk from TAYLOR's apartment building. Per Se has three Michelin stars. TAYLOR used approximately $68,122.03 of Charity-1 funds to pay for meals at Per Se from in or about 2017 through in or about 2022.

   d. Marea is a fine-dining restaurant in midtown Manhattan located approximately a six-minute walk from TAYLOR's apartment building. From in or about 2017 through in or about 2021, TAYLOR used approximately $26,770.43 of Charity-1 funds to pay for meals at Marea.

   e. Masa is a fine-dining sushi restaurant in midtown Manhattan located approximately a six-minute walk from TAYLOR's apartment building. Masa has three Michelin stars. From in or about 2018 through in or about 2022, TAYLOR used approximately $25,930.90 of Charity-1 funds to pay for meals at Masa.

   f. In addition, from in or about 2017 through in or about 2022, TAYLOR used more than approximately $100,000 of Charity-1 funds to pay for meals at other fine-dining restaurants and steakhouses in Manhattan.

19. Based on my conversations with other law enforcement officers and my examination of Charity-1 and bank and PayPal records for accounts used by KEITH TAYLOR, the defendant, I have learned the following, in substance and in part:

  a. From in or about 2017 through in or about 2022, TAYLOR spent approximately $182,935.21 of Charity-1 funds on food delivery services and local New York courier services.

  b. In or about 2022, TAYLOR used $44,988.20 of Charity-1 funds to make payments on his personal credit card.

  c. From in or about 2020 through in or about 2022, TAYLOR used approximately $63,000.00 of Charity-1 funds to pay for his personal medical expenses, including his own cosmetic and plastic surgery.

<u>TAYLOR's Personal Spending of Charity-1's Funds was Previously Flagged as Improper</u>

  20. Based on my conversations with other law enforcement officers and my review of IRS records and reports, I have learned, in substance and in part, that KEITH TAYLOR, the defendant, and Charity-1, had previously been audited by the IRS for the calendar years 2009 through 2011. The IRS audit focused on TAYLOR's use of Charity-1 funds for his personal expenses in the period from 2009 through 2011, and resulted, in 2017, in a stipulated decision that TAYLOR owed the IRS over $250,000 in back taxes on the income he received from Charity-1 and did not report. TAYLOR has not paid the IRS the back taxes he owes resulting from this audit.

  21. Based on my conversations with other law enforcement officers, my review of various records and reports, and my conversations with a particular witness ("Witness-1"), I have learned the following, in substance and in part:

  a. Witness-1 was Charity-1's Accountant from in or about 2005 through in or about 2008, and was the Chief Financial Officer of Charity-1 from in or about 2008 through in or about 2010.

  b. Witness-1 asked KEITH TAYLOR, the defendant, about his personal expenses that appeared on Charity-1's books, and TAYLOR was unable to justify the business purposes of those expenses, merely responding that the board of directors approved his expenses.

  c. TAYLOR fired Witness-1 in or about 2010 after a confrontation about his expenses.

  22. Based on my conversations with other law enforcement officers and my review of New York State records and reports, I have learned, in substance and in part, that KEITH TAYLOR, the defendant, let Charity-1's tax exempt status in New York State lapse after 2011, and failed to file paperwork with the New York Attorney General's Charities Bureau reflecting an independent financial report signed by the president or other authorized officer and the Chief Fiscal Officer of Charity-1. Without those filings, Charity-1 has been prohibited from conducting charitable or fundraising activity in the state of New York. Despite not filing the necessary paperwork with the New York Attorney General's Office, TAYLOR has conducted charitable and fundraising activity on behalf of Charity-1 in the state of New York since 2011.

### TAYLOR Created a Fake Board of Directors to Enable His Embezzlement

23.     Based on my conversations with other law enforcement officers and victims of KEITH TAYLOR, the defendant, whose names were used on Charity-1's website, and my examination of Charity-1 and open-source records, I have learned, in substance and in part, that from at least in or about 2016 through the present, TAYLOR falsely claimed to prospective donors that Charity-1 had a functioning board of directors approving Charity-1's and TAYLOR's expenses, and that certain individuals were members of that board of directors. *See infra* ¶¶ 24-28.

24.     Based on my conversations with other law enforcement officers, and my review of open-source records, including the annual reports posted on Charity-1's website, I have learned that KEITH TAYLOR, the defendant, in the 2011-2012 Annual Report posted on the Charity-1 website, described recruiting Charity-1's new board of directors (the "Charity-1 Board") by seeking out "persons who were experts in the fields most critical to [Charity-1's] long-term growth – finance, law, public relations, and organizational management."

25.     Based on my conversations with other law enforcement officers and with Victim-1, and my examination of Charity-1 records and open-source records, I have learned the following, in substance and in part:

   a.  Victim-1 has known KEITH TAYLOR, the defendant, since in or about 2013, and originally met TAYLOR when Victim-1 was a bartender at Jean-Georges. Victim-1 is also a playwright and producer.

   b.  From in or about November 2018 through the present, Victim-1 has been listed on Charity-1's website and on Charity-1's Forms 990 as an independent, voting member of the Charity-1 Board.

   c.  Victim-1 was not on the Charity-1 Board and has never participated in any Charity-1 Board meetings. Victim-1 has never approved any of TAYLOR's or Charity-1's expenses.

   d.  Victim-1 did not know that Victim-1's name was identified by TAYLOR as a member of the Charity-1 Board.

   e.  In or about 2018, TAYLOR asked Victim-1 to participate in approximately two phone calls between TAYLOR and an attorney during which the attorney asked TAYLOR about Charity-1's expenses. Victim-1 participated in those phone calls because TAYLOR asked Victim-1 to do so as a favor.

26.     Based on my conversations with other law enforcement officers and with a particular individual ("Victim-2"), and my examination of Charity-1 records, open-source records, and materials obtained from Victim-2, I have learned the following, in substance and in part:

   a.  Victim-2 has been the house-cleaner for KEITH TAYLOR, the defendant, since in or about 2015, and also cleaned Charity-1's offices from in or about 2016 through in or about 2018.

  b. From in or about June 2016 through the present, Victim-2 has been listed on Charity-1's website as an independent, voting member of the Charity-1 Board.

  c. Victim-2 was not aware that Victim-2's name was identified by TAYLOR as a member of the Charity-1 Board.

  d. Victim-2 was never on the Charity-1 Board, and never attended a Charity-1 Board meeting. Victim-2 has never approved any of TAYLOR's or Charity-1's expenses.

  27. Based on my conversations with other law enforcement officers and a particular individual ("Victim-3"), and my examination of Charity-1 and open-source records, and materials obtained from Victim-3, I have learned the following, in substance and in part:

  a. Victim-3 has known KEITH TAYLOR, the defendant, since in or about 2014, when they first became friends.

  b. In or about 2015, TAYLOR hired Victim-3 to work at Charity-1 as his personal assistant. Victim-3 was employed by Charity-1 for approximately eight months.

  c. TAYLOR has taken Victim-3 to expensive dinners at Jean-Georges, Per Se, and Marea.

  d. From in or about June 2016 through the present, Victim-3 has been listed on Charity-1's website and the Charity-1 Forms 990 as an independent, voting member of the Charity-1 Board.

  e. In or about 2015, TAYLOR asked Victim-3 if Victim-3 wanted to be on the Charity-1 Board and said that it would be helpful to have Victim-3's name on the Board.

  f. Victim-3 has never attended any Charity-1 Board meetings and did not know if Charity-1 had an actual Board. Victim-3 has never approved any of TAYLOR's or Charity-1's expenses.

  28. Based on my conversations with other law enforcement officers and Victim-3, and my examination of documents provided by Victim-3, I have learned the following, in substance and in part:

  a. On or about December 9, 2015, at the request of KEITH TAYLOR, the defendant, Victim-3 spoke to a lawyer for Charity-1 ("Lawyer-1"), who was simultaneously representing Charity-1 and KEITH TAYLOR, the defendant, in the IRS tax audit investigating TAYLOR's improper use of Charity-1 funds.

  b. Lawyer-1 sent a waiver of conflict letter to Victim-3, addressed to Victim-3 as the Secretary of Charity-1, and requested that Victim-3 send him a copy of the board minutes from December 9, 2015, and a letter, in his or her own words, waiving the conflict between Charity-1 and TAYLOR.

   c. On or about December 10, 2015, TAYLOR sent Lawyer-1 an email, attaching purported board minutes and a letter purportedly from Victim-3, stating that Victim-3 asked TAYLOR to send the email for Victim-3.

   d. The attachment to the email sent by TAYLOR on or about December 10, 2015, purported to be a copy of the minutes of a Charity-1 Board meeting held on December 9, 2015. The purported minutes reflected a conflict waiver and a unanimous "symbolic vote of confidence in TAYLOR's leadership." The purported board minutes appeared to be signed by Victim-3 as the Secretary of the Charity-1 Board.

   e. The attachment to the email sent by TAYLOR on or about December 10, 2015, also contained a purported letter from Victim-3 representing that the Charity-1 Board determined that there was "no conflict of interest whatsoever" between Charity-1 and TAYLOR. The purported letter also appeared to be signed by Victim-3 as the Secretary of the Charity-1 Board.

   f. Victim-3 has never attended a Charity-1 Board meeting, and while working at Charity-1 never heard anything about a board of directors other than from TAYLOR.

<u>TAYLOR Deceived Donors About How Funds Were Used</u>

  29. Based on my conversations with other law enforcement officers and my review of open-source records, including Charity-1's website, I have learned, in substance and in part, that KEITH TAYLOR, the defendant, had exclusive control over the content on Charity-1's website, and TAYLOR made false and misleading statements on Charity-1's website to prospective donors and to all visitors to the website about how Charity-1 spent the donations it received. For example:

   a. The Charity-1 Annual Report for the years 2015 to 2017 claims "because we have such low overhead, we'll be able to allocate nearly all of that funding to the hard-working families who need our help the most." The Charity-1 Annual Report for the years 2015 to 2017 is signed by KEITH TAYLOR, the defendant, as President and Executive Director of Charity-1, and dated August 21, 2018.

   b. The Charity-1 Annual Report for the years 2018 and 2019 claims "we trimmed our expenses to the point that [Charity-1] itself could operate comfortably on the funds made available to us from our individual donors, as opposed to depending on major grantors to fund our operating costs." The Charity-1 Annual Report for the years 2018 and 2019 is signed by TAYLOR, as President and Executive Director of Charity-1, and dated October 31, 2019.

  30. Based on my conversations with other law enforcement officers and my review of open-source records, including Charity-1's website, and my analysis of Charity-1's bank account and PayPal records, I have learned the following:

   a. KEITH TAYLOR, the defendant, posted a Charity-1 Annual Report on Charity-1's website for the years 2015-2017, 2018-2019, and 2020-2021. In each Annual Report, TAYLOR included a snapshot of financial information for the year and a link to the Charity-1 Form 990.

   b. The financial information TAYLOR posted on Charity-1's website does not reflect the actual use of the funding that Charity-1 received. Specifically, it makes no mention of

TAYLOR's salary or the use of Charity-1 funds for TAYLOR's personal expenses. Instead, it shows Charity-1's "Management/Administrative Expenses" and "Fundraising Expenses" by year as follows:

| Year | Management/Administrative Expenses | Fundraising Expenses |
|---|---|---|
| **2016** | $74,346.00 | $62,911.00 |
| **2017** | $43,034.00 | $59,567.00 |
| **2018** | $45,036.00 | $38,663.00 |
| **2019** | (unreported) | (unreported) |
| **2020** | $87,367.00 | $82,541.00 |
| **2021** | $136,307.00 | $112,780.00 |

c. The financial information that TAYLOR posted on Charity-1's website does not accurately reflect TAYLOR's and Charity-1's actual spending.

31. Based on my conversations with other law enforcement officers and my review of IRS records and reports, I have learned, in substance and in part that:

a. KEITH TAYLOR, the defendant, posted publicly on Charity-1's website the Forms 990 for Charity-1 that he filed with the IRS. Those Forms 990, which TAYLOR signed, contained multiple false and misleading statements as described further below.

b. TAYLOR falsely stated on Charity-1's Forms 990 that the Charity-1 Board met with Charity-1's external auditors and unanimously approved each Form 990 prior to its filing. In fact, Charity-1 has not had an external audit of its financials since 2010, and none of Victim-1, Victim-2, or Victim-3 ever reviewed Charity-1's financials or voted on its Form 990.

c. TAYLOR further falsely stated on Charity-1's Forms 990 that the Charity-1 Board set TAYLOR's compensation based on analysis of comparative data. In fact, no one approved TAYLOR's compensation between at least 2016 and 2022, and none of Victim-1, Victim-2, or Victim-3 ever reviewed data or otherwise approved TAYLOR's compensation.

### TAYLOR Failed to File Tax Returns

32. Based on my discussions with other law enforcement officers, as well as my review of documents and records supplied by the IRS and my examination of other bank and PayPal records, I have learned the following:

a. KEITH TAYLOR, the defendant, has not filed his personal income taxes since the IRS began its audit of Charity-1 and TAYLOR in 2013.

b.  Relevant here, TAYLOR did not file an individual income tax return for himself for any of the tax years 2017 through 2022. The IRS also has no record of TAYLOR having filed a Form 990 for Charity-1 for 2022.

c.  TAYLOR is the sole known signatory on at least two personal bank accounts and multiple personal PayPal accounts (the "Taylor Accounts").

d.  The Taylor Accounts received payments by electronic transfer from various Charity-1 bank and PayPal accounts, as described further above, *supra* ¶¶ 14(a)-(g). In addition, TAYLOR used Charity-1 bank accounts and debit cards to pay his personal expenses, as set forth above, *supra* ¶¶ 16-19. In total, for the period 2017 through 2022, TAYLOR received approximately $3,118,237.35 in direct payments or payments for personal expenses from Charity-1.

e.  For tax years 2017 through 2022, the income that TAYLOR received from Charity-1 gives rise to a tax due and owing to the IRS of at least approximately $1,026,408, to wit:

| Year | Unreported Income | Estimated Tax Due and Owing |
|---|---|---|
| 2017 | $341,285.18 | $93,928.00 |
| 2018 | $339,249.05 | $90,227.00 |
| 2019 | $309,876.44 | $79,380.00 |
| 2020 | $546,474.27 | $176,010.00 |
| 2021 | $1,261,408.86 | $468,123.00 |
| 2022 | $319,943.55 | $118,740.00 |
| **Total** | **$3,118,237.35** | **$1,026,408** |

WHEREFORE, I respectfully request that a warrant be issued for the arrest of KEITH TAYLOR, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

/s/ LaVale Jackson, by SDA with permission
_____
LaVale Jackson
Special Agent
United States Attorney's Office
for the Southern District of New York

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 4th day of June, 2024.

_____
THE HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York